*Maurice Malik Moseley v. State*, No. 0137 of the 2019 Term, Opinion by Moylan, J.

**HEADNOTE:**

UNLAWFUL POSSESSION OF AMMUNITION – THE CONTENTIONS – AN EVIDENTIARY ADDENDUM – ODDITY OF ODDITIES – CONSTRUCTIVE POSSESSION – THE JIGSAW PUZZLE OF 5 PEBBLE DRIVE – DRAMATIS PERSONAE – CONTRABAND: WHAT AND WHERE – CIRCUMSTANTIAL PROOF OF POSSESSION – PROXIMITY: WHERE AND WHEN – VIEW OR KNOWLEDGE – THE TIME FACTOR – THERE WAS NO CLEAR VIEW – THE MALE OCCUPANT OF THE BACK BEDROOM – MARYLAND CASELAW – OWNERSHIP OR OTHER POSSESSORY CONTROL OF THE PREMISES – MUTUAL USE AND ENJOYMENT OF AMMUNITION – OUT OF NOTHING, NOTHING – POSTSCRIPT

Circuit Court for Anne Arundel County
Case No. D-07-CR-18-006774

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0137

September Term, 2019

_____

MALIK MAURICE MOSELEY

V.

STATE OF MARYLAND

_____

Kehoe,
Arthur,
Moylan, Charles E., Jr.
   (Senior Judge, Specially Assigned),

_____

Opinion by Moylan, J.

_____

Filed:  April 8, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

The most unexciting of cases may occasionally possess a hidden analytic gravitas that it would be imprudent to ignore. The seeming insignificance may arise from the fact that the case does not go to the hard core of criminality but lies only on the fringe of criminality (or, more precisely, on the fringe of proof of criminality). In dealing, as we are herein, with a possessory crime, mere constructive possession lacks much of the drama of actual possession. We lack eyewitness testimony, and are fed only the thin gruel of permissive inferences arising out of surrounding circumstances. A real bird in the hand is always more exciting than two constructive birds in the bush.

This slippage of serious attention is aggravated exponentially, moreover, when the object of possession is not of the primary contraband that drives the investigation and the prosecution but is only secondary or coincidental contraband left over as so much trial detritus. When, as in the case now before us, all issues with respect to the unlawful possession of contraband narcotics had been resolved and the lustre of the trial had faded, we were left only with the unlawful possession of ammunition. What hidden significance, if any, might lurk therein?

The appellant, Malik Maurice Moseley, was convicted in the Circuit Court for Anne Arundel County by a jury, presided over by Judge Glenn L. Klavans, of the unlawful possession of ammunition. He was sentenced by Judge Klavans to the maximum term of one year's imprisonment.

### The Contentions

On appeal, he raises three contentions:

1. The evidence was not legally sufficient to support the conviction for the possession of ammunition;

2. The State, in closing argument to the jury, misstated the law with respect to constructive possession; and

3. Judge Klavans erroneously failed to give a supplemental instruction following two questions by the jury.

The appellant failed, by way of timely objection, to preserve for appellate review either the second or the third contention. Maryland Rule 8-131(a) provides that "the appellate court will not decide any other issue (other than the jurisdiction of the trial court) unless it plainly appears by the record to have been raised in or decided by the trial court." We are not inclined, moreover, to overlook non-preservation by way of noticing plain error. We will deal, therefore, only with the first contention.

**An Evidentiary Addendum**

Our exclusive focus will be on the legal sufficiency of the evidence to support the conviction for the unlawful possession of ammunition by a prohibited person[1]. Our focus is at best slightly skewed, however, by two factors. The first is that ammunition, as a forbidden contraband, was not the primary focus of the trial. It was, at most, something only in the peripheral vision of the trial.

The case was, from start to finish, about drugs and drug paraphernalia and drug addicts. It was triggered by two fatal drug overdoses that brought emergency medical personnel and the police to a trailer home twice in little more than 24 hours. Its centerpiece

---

[1] "Prohibited person" is an awkward usage. The appellant nonetheless was, by stipulation, a "prohibited person."

was a search and seizure warrant for narcotic drugs. The presence of some ammunition in the middle of a cornucopia of drugs and drug paraphernalia was simply an unexpected evidentiary addendum. The addendum, however, is all we have.

## Oddity of Oddities

As this investigation unfolded, moreover, the appellant himself never appeared to have been the central character of the story. As fans of Alfred Hitchcock over the years can verily attest, the moviegoer has very little to go on in assessing the significance of one who appears only fleetingly in a no more than cameo role. What we actually know about the appellant, Malik Maurice Moseley, in this case casts him as little more than an extra.

The conviction itself was for a misdemeanor of relatively modest gravity. In this film noir in a trailer park, the lead villain was the crime of possession of cocaine with intent to distribute. Solid supporting roles were filled by the possession of amphetamine and the possession of narcotic paraphernalia. In this narrative at least, the possession of ammunition was no more than a cameo appearance.

The police had contact with 5 Pebble Drive on essentially three occasions, the latter two overlapping. On June 12, 2018, officers responded to a call for emergency medical assistance for a possibly fatal drug overdose. It was a fatal overdose. When Detective Joseph Goldberg arrived on the scene, he spoke to several other police officers and to a couple of civilians who were standing in the driveway in front of 5 Pebble Drive. One of them was the appellant. The appellant told Detective Goldberg that he lived at 5 Pebble Drive. No further information was developed at that time with respect to the appellant. He was simply someone standing on the edge of the scene.

3

The second contact occurred on the following day, June 13, 2018 at about 5:30 p.m., when the police received yet another call for emergency medical assistance, an apparent drug overdose that turned out to be another fatal overdose. For the obvious reason that he was then in police custody for an unrelated reason (a traffic stop), the appellant was not even present at 5 Pebble Drive on that second occasion.

Based upon inculpatory evidence observed during that second visit, however, the police requested a search warrant for 5 Pebble Drive. At approximately midnight, a search warrant was issued and a search of the premises followed immediately during the early morning hours of June 14, 2018. During that search, which we will designate as the third contact, the appellant was once again completely absent. The only observation of the appellant at 5 Pebble Drive had been on the first police visit of June 12 and that was outside on the driveway along with others. He was never seen inside of 5 Pebble Drive. He was never seen going into or coming out of 5 Pebble Drive. Ordinarily, the quintessence of a cameo appearance is that it is innocuous. The incongruity now before us is that it was the cameo appearance that ultimately won the Oscar.

## Constructive Possession

A second slightly complicating factor is that this case is built entirely on circumstantial evidence. At the end of the trial, five counts against the appellant went to the jury. Each charged the unlawful possession of a form of contraband. The charges going to the jury were:

Count 3: <u>Possession</u> of Cocaine with Intent to Distribute

Count 4: <u>Possession</u> of Cocaine

4

Count 8: <u>Possession</u> of Amphetamine

Count 9: <u>Possession</u> of Ammunition

Count 10: <u>Possession</u> of Drug Paraphernalia

With respect to each of those counts charging unlawful possession, the State's only evidence went to the establishment of constructive possession. There was in the entire trial not a scintilla of evidence pointing to the direct or physical possession of any of the items of contraband. At no time was the appellant ever observed with any of the charged items of contraband in his hand or under his control or even in his immediate physical presence. When the police first observed the contraband, the appellant was in police custody at the station house.[2] The only form of possession involved in this case was constructive possession. That, by definition, brings us into the kaleidoscopic world of circumstantial evidence.

Circumstantial evidence, of course, once admitted, is just as valid as direct eyewitness evidence. It does, however, implicate an additional mental step— the drawing of the permitted inference from the proved predicate facts. In <u>Anaweck v. State</u>, 63 Md.App. 239, 242, 492 A.2d 658 (1985), this Court spoke of the two-step process.

> The appellants were not caught with the contraband in their hands. That, of course, is not legally fatal to proof of possession, but <u>it does at least make the burden of persuasion a heavier one</u>. "Possession and control need not be immediate and direct but may be constructive."

(Emphasis supplied.)

---

[2] To be in police custody away from the crime scene is truly to enjoy an "ironclad alibi."

5

What is involved, of course, is not the proof of a single direct fact but the proof of a series of predicate facts and then an induction from these predicate facts.

> A single eyewitness, lucky enough to catch a culprit red-handed, can <u>in a few sentences easily prove sole and actual possession of contraband</u>. The proof of joint or constructive possession, on the other hand, is frequently more circuitous and frequently involves <u>a set of predicate circumstances from with the inference of joint or constructive possession may permissibly arise</u>.

63 Md.App. at 243. (Emphasis supplied.)

When a fortuitous snapshot of the very happening of the <u>corpus delicti</u>, to wit, an eyewitness, is not available, then to survey the surrounding predicate facts and to observe the scene over a longer time span permits us to paint on a circumstantial canvas. What then is the palette with which we work? What then are the ways in which to paint a picture of constructive possession? Like Elizabeth Barrett Browning, let us count the ways. There is, of course, the place. There are possible sub-divisions of that place. There may, moreover, be people in or about that place. There are goods and chattels in that place. From the concatenation of all of those predicate facts, there may emerge the discernible mosaic of the crime that probably transpired in that place. Inference can be an amazingly powerful technique.

## The Jigsaw Puzzle Of 5 Pebble Drive

Prominent among those predicate facts is the geography of the place where the alleged possession occurred. The place in question is 5 Pebble Drive. At the very least, there is a kitchen in 5 Pebble Drive. There is also, to be sure, a back bedroom with a closet. There is as well a front bedroom, also with a closet. Both the appellant's brief and the State's brief describe 5 Pebble Drive as having "multiple bedrooms, a kitchen, and other

areas." In ordinary usage, the adjective "multiple" suggests three or more. At one point in the cross-examination of Detective Daniel Rodriguez, the detective replied to the counsel for the appellant:

> [DEFENSE COUNSEL]: Now there are two bedrooms in this house, isn't that correct?
>
> [RODRIGUEZ]: <u>I would say three bedrooms</u>, ma'am.

(Emphasis supplied.)

As the photographs of the crime scene further reveal, both the front bedroom and the rear bedroom have closets that appear to be tightly packed (indeed, overflowing) with clothing, both male and female. The photographic survey did not reveal the presence or the possible contents of a possible closet in the third bedroom. Neither, to be sure, did it reveal the absence of such a closet. Circumstantial evidence can be ambiguous. And ambiguity, of course, helps the party who was spared the burden of proof.

**Dramatis Personae**

Who owns 5 Pebble Drive? Who possesses 5 Pebble Drive? Who simply "lives" there and how regularly does such living occur? Where precisely do they live within the larger place? Who else may live there? Who else visits regularly? All of these are pieces of the jigsaw puzzle we would like, if possible, to fit together. A reliable census, however, was not available. In the surrounding circumstances, there was a lot of guesswork and a lot of uncertainty. If the stolen Maltese Falcon or a smoldering marijuana joint had been sitting in the middle of the dining room table, who, if anyone, could be deemed to have been in

unlawful contact with one or both? Involved is the art of inducing constructive possession. Unlike eyewitness observation of direct physical possession, it is an art.

The appellant, Malik Maurice Moseley, was clearly one person associated with 5 Pebble Drive. When Detective Joseph Goldberg arrived on the scene at approximately 5:30 p.m. on June 12, 2018, he saw the appellant and one or two other persons standing on the driveway outside of 5 Pebble Drive. In a very brief conversation, the appellant informed Detective Goldberg that he lived at 5 Pebble Drive. That is essentially the sum total of the police contact with the appellant on June 12. On the afternoon of the next day, June 13, 2018, the appellant was in police custody after being arrested for a traffic infraction. At the station house, Detective Daniel Rodriguez spoke to him briefly. In that conversation, the appellant again acknowledged that he lived at 5 Pebble Drive.

There was one other item of evidence connecting the appellant to 5 Pebble Drive. When the search and seizure warrant was executed during the early morning hours of June 14, 2018, there was found in the back bedroom, a document addressed to "Malik Moseley, 4147 Audrea Avenue, Baltimore, Maryland." The police believed that the correct and intended address was actually "Audry Avenue," a street address in the nearby Brooklyn area of upper Anne Arundel County. Somewhat ambiguously, the document both connects the appellant with 5 Pebble Drive but also suggests that his legal address may have been elsewhere, albeit in the general area, and that his "living" connection with 5 Pebble Drive may have been in some sense informal or sporadic. Although the location of the document connects the appellant with 5 Pebble Drive, its address derogates from the likelihood that

8

the appellant had any significant proprietary or possessory interest in 5 Pebble Drive. The document cut both ways.

A second person unquestionably associated with 5 Pebble Drive was Tanya Swecker. Although his testimony was subsequently stricken as hearsay, Detective Rodriguez said that he had learned that the legal owner of 5 Pebble Drive was Debra Anderson, the mother of Tanya Swecker. In any event, it was Tanya Swecker who was in possessory control of 5 Pebble Drive and it does not matter whether she or her mother was the legal owner in fee simple. The search of the premises, moreover, revealed a debit card belonging to Tanya Swecker on a corner dresser in the back bedroom.[3]

Two other names associated with 5 Pebble Drive were Michael Thomas and Yanek Ford. When the appellant was briefly questioned by Detective Goldberg on June 12, 2018, Michael Thomas was present with him in the driveway just outside 5 Pebble Drive. A log maintained by the police placed both Michael Thomas and Yanek Ford inside 5 Pebble Drive as of 5:40 p.m. on June 13, 2018. Their precise status was exasperatingly murky and that, of course, adds to the problem of constructing constructive possession.

During the 36-hour period between the late afternoon of June 12 and the early morning of June 14, moreover, the police logs indicate that a large number of persons-- as many as 25 according to one bit of testimony-- were in and out of 5 Pebble Drive. Although it was assumed that most of these were either emergency medical personnel or police

---

[3] Tanya Swecker was initially indicted as a co-defendant of the appellant, but did not stand trial with him because she entered a guilty plea. Prior to the appellant's sentencing, Tanya Swecker died.

officers, it nonetheless appears that there could have been several civilians as well. Clarification on that issue was available but sadly neglected. Inferring constructive possession of an item of contraband from a suspect's proximity to the contraband is a very different exercise if one or two suspects are in the room than it is if 10 or 15 suspects are in the room. Because the burden of proving the predicate facts that may give rise to a permitted inference of constructive possession is allocated to the State, it behooves the State to do all that it can to reduce the ambiguities and uncertainties that may inhibit the predicate facts. It is not for the defense to prove that other extraneous possible culprits were in the trailer; it is for the State to prove that other extraneous possible culprits were not in the trailer. Factual ambiguity only helps the defense. It can be fatal to the State. The critical inference to be drawn must be not merely a possibility but a reasonable likelihood. The heavier the traffic, the more varied are the circumstances, and the lesser, therefore, the likelihood.

Speaking of other possible visitors who might explain the presence of contraband in the trailer, let us not forget the two departed overdosers for whom the bell tolled. During the critical hours immediately preceding the police discovery of the various items of contraband, they were both in the trailer and were self-evidently involved with narcotics contraband. One was expressly taken from a bed in one of the bedrooms. They cannot be eliminated from the equation and they obviously may influence the result.

### Contraband: What And Where?

And what of the chattels? The numerous police photographs of the interior of 5 Pebble Drive reveal that interior of the trailer to have been a pigsty of tatterdemalion clutter.

The closets were overflowing. The top of every table or stand was jam-packed with items, most of them innocuous, in chaotic disarray. A small amount of cocaine was found in a separate bedroom, but most of the contraband that led to the charges against the appellant were found in either the kitchen or the back bedroom.

One largely full box of ammunition, containing 52 cartridges, was found in the rear of a high shelf in a storage area of the kitchen. Realistically, it can be dismissed from any further consideration of constructive possession in this case. No gun was ever recovered from anywhere in 5 Pebble Drive. Also recovered from the top of a refrigerator was a digital scale.

The remaining contraband that led to the charges against the appellant was found in the back bedroom. From a drawer in a nightstand, the police recovered an unmarked bottle of four pills, which on analysis turned out to be amphetamines. The most significant amount of cocaine found in the search was in a Zip-loc bag found sitting on a coffee filter somewhere in the back bedroom. Of the five charges of unlawful possession of contraband that were submitted to the jury against the appellant, the previously described contraband accounts for four of those five charges. The jury found the appellant not guilty on all four of those charges.

The only count on which the appellant was convicted was Count Nine, charging the unlawful possession of ammunition. The ammunition found in the search of 5 Pebble Drive was found in two places. The conviction could not possibly have been based on the box of cartridges found in a relatively remote storage closet in the kitchen. It had to have been based on eight cartridges found on top of a dresser in a corner of the back bedroom across

11

the room from the bed and the nightstand. The top of that dresser, incidentally, was cluttered with numerous other incidental items. It is of that conviction that we are called upon to assess the legal sufficiency of the evidence to support it.

In any event, this is where the various items of contraband were found in 5 Pebble Drive. The five charges of unlawful possession that went to the jury against the appellant included four separate acts of possession.[4] The appellant was charged with possessing four forms of contraband: 1) cocaine, 2) amphetamine, 3) drug paraphernalia, and 4) ammunition. With respect to all of these possessory charges, there was no scintilla of evidence suggesting direct physical possession. Each of the charges involved simply proof of constructive possession. The bulk of the cocaine seems to have been found in two places: 1) loose on a coffee filter on a waist-high shelf in the front bedroom and 2) in a closed Zip-loc bag on a refrigerator or freezer in the kitchen. The amphetamine, the drug paraphernalia, and the ammunition were all found in the rear bedroom. With regard to each of the forms of contraband, moreover, the evidentiary guidelines for proving constructive possession are precisely the same. The final tally of four verdicts of not guilty of unlawful possession and one verdict of guilty of unlawful possession was incongruously strange.

## Circumstantial Proof of Possession

Maryland Code, Criminal Law Article, Sect 5-101(v) defines "Possess" in the following terms: "'Possess' means to exercise actual or constructive dominion or control over a thing by one or more persons." Its earlier version, as Art. 27, Sect. 277(s) was

---

[4] Count 3 charging the possession of cocaine with the intent to distribute and Count 4 charging the simple possession of cocaine involved, of course, the same act of possession.

verbatim. As early as 1964, Judge Hammond had observed for the Court of Appeals in

Henson v. State, 236 Md. 518, 524-25, 204 A.2d 516 (1964):

> That the narcotics were not on his person but only in the house of which he was a resident did not prevent the inference the police and the trial court drew—that he had possession and control of narcotics—from properly being drawn. Possession and control need not be immediate and direct but may be constructive.

(Emphasis supplied.)

In Garrison v. State, 272 Md. 123, 321 A.2d 767 (1974), the Court of Appeals reversed the conviction of Shirley Garrison for the unlawful possession of heroin, notwithstanding the fact that she was the co-lessee of the house with her husband in which the heroin was found and notwithstanding the further fact that the heroin was found in the bedroom in which she slept.  Judge O'Donnell wrote for the Court:

> [B]efore the State may obtain a conviction it must adduce evidence to meet the test of legal sufficiency; that evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited narcotic drug in the sense contemplated by the statute, i.e., that she exercised some restraining or directive influence over it.

272 Md. at 142. (Emphasis supplied.) It was not enough just to know that it was there. See also State v. Leach, 296 Md. 591, 596, 463 A.2d 872 (1983). One must be in dominion or control.

The absence of knowledge of the presence of contraband would clearly foreclose the existence of constructive possession. As Judge Eldridge pointed out for the Court of Appeals in Dawkins v. State, 313 Md. 638, 649, 547 A.2d 1041 (1988):

> [A]n individual would not be deemed to exercise "dominion or control" over an object about which he is unaware. Knowledge of the presence of an object is normally a prerequisite to exercising dominion and control.

13

(Emphasis supplied.)

Such knowledge, however, may be inferred from the predicate facts. Judge Cathell wrote for the Court of Appeals in State v. Suddith, 379 Md. 425, 432, 842 A.2d 716 (2004):

> An individual's knowledge of the contraband is a key element in finding that individual guilty of possessing it and that knowledge may be proven by inferences from the totality of the evidence, circumstantial or direct, presented to the trier of fact.

(Emphasis supplied.) See also Archie v. State, 161 Md.App. 226, 245, 867 A.2d 1120 (2005)("Knowledge of the presence and illicit nature of narcotics may be proven by inference from the circumstances as a whole.").

To constitute constructive possession, the possession need by no means be exclusive. Joint possession can be just as inculpatory. Judge Orth wrote for this Court on the subject of joint possession in Jason v. State, 9 Md.App. 102, 111, 262 A.2d 774 (1970), cert. denied, 258 Md. 728 (1970):

> We find that the evidence was sufficient to sustain the convictions as to each appellant of possession of heroin, control of heroin and possession of narcotic paraphernalia as charged. We note that it is not required that there be sole possession and sole control; there may be joint possession and joint control in several persons. And the duration of the possession and the quantity possessed are not material, nor is it necessary to prove ownership in the sense of title.

(Emphasis supplied).

In Folk v. State, 11 Md.App. 508, 275 A.2d 184 (1971), this Court picked up on Jason v. State and compiled what is now widely accepted as the controlling set of guidelines for determining joint and/or constructive possession.

> The common thread running through all of these cases affirming joint possession is 1) proximity between the defendant and the contraband, 2) the

14

fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

11 Md.App. at 518. (Emphasis supplied). See State v. Gutierrez, 446 Md. 221, 234, 130 A.3d 985 (2016); Smith v. State, 415 Md. 174, 198, 999 A.2d 986 (2010); Hall v. State, 119 Md. App. 377, 394, 705 A.2d 50 (1998). Folk v. State is the primary template we will use to assess the legal sufficiency of the evidence to support the appellant's conviction for the constructive possession of ammunition.

## Proximity: Where And When?

The caselaw speaks of the "proximity between the defendant and the contraband." Ordinarily, that inquiry would raise the question of "Where?" The inquiry in this case, apparently as one of first impression, raises the additional question of "When?"

The police search of 5 Pebble Drive, pursuant to a search and seizure warrant, took place on the early morning of June 14, 2018, at approximately 2 a.m. It was then that the police discovered various items of contraband and took numerous photographs of that contraband at specific locations in specific rooms. Those specific locations, as of 2:00 a.m. on June 14, ordinarily would become the points of departure from which to measure proximity. Proximity? Proximity to what? Proximity to whom? Ordinarily the defendant, on whose proximity we are focusing, would be the driver or one of the passengers in the car in which the contraband is found— or would be standing or sitting in the room (or adjacent room) in which the contraband is found. He would be there, or nearby, and a tape

15

measure would be available. This appellant, by unique contrast, was somewhere downtown in a police stationhouse. His presence on the driveway outside 5 Pebble Drive had been established as of approximately 36 hours earlier, on the late afternoon of June 12. There was no direct evidence that he had even been at 5 Pebble Drive since then.

The State, however, with the audacity and dexterity of H.G. Wells's time traveler[5], presumes to conflate the early morning of June 14 with the last night when appellant presumably slept at 5 Pebble Drive, some 24 or 48 hours before. The State would have us measure the proximity between where the appellant probably was **THEN** and where the contraband (as of June 14) is **NOW**, assuming, of course, that the contraband has not been moved or altered in any way and is **NOW** exactly where it was and in the same condition that it was **THEN**. In terms of such a completely undisturbed scene, however, let it be remembered that the police log itself listed approximately 25 persons, emergency medical personnel and police officers plus a civilian or two, traipsing in and out of that small trailer in the intervening 36 hectic hours. "**DON'T ANYBODY TOUCH ANY CONTRABAND**!"

It may be that the very notion of proximity does not permit the assessment the State would have us make in this case, to wit, the assessment of the proximity between two places at two different times. As a space-time phenomenon, the very passage of time would ordinarily erode proximity as surely as does distance. In such a case, we would be asked to measure the immeasurable. To have been at an earlier time close to the spot where the

---

[5]      H.G. Wells, <u>The Time Machine</u> (1895).

ammunition is found at a later time would be, except in extremely rare circumstances, not proximity. As a general rule, proximity assumes contemporaneity.

It is prudent, of course, never to say "never." Our analysis of the effect of the passage of time on the factor of proximity (an analysis of first impression) is, we believe, a valid one. A necessary caution, however, is to be alert to such modifiers as "ordinarily" and "as a general rule." If the evidence in a given case could establish that in the interim between **THEN** and **NOW**, no one had entered the room where the contraband was later found or could have affected it in any way, the passage of time might then have lost its possibly erosive effect. In such a circumstance, such evidence could be said to have frozen time in its tracks. We would, therefore, properly be measuring the proximity between where the suspect was **THEN** and where the contraband was **THEN,** because where the contraband is **NOW** would have been shown to be precisely where the contraband was **THEN**. The circumstances would have negated any possibly erosive effects of the passage of time. In such circumstances, but only in such circumstances, time would, indeed, stand still. In this case, of course, no such immutability between **THEN** and **NOW** was established. "The moving finger writes, and, having writ, moves on."[6]

Without more being said, we dismiss proximity as a pertinent factor in the assessment of constructive possession in this case. It may well be that this temporal disconnect should call automatically for a dismissal of the entire constructive possession

---

[6]    Edward Fitzgerald, The Rubaiyat of Omar Khayyam (1859).

analysis. Because the end result, in any event, is going to be the same, we will go forward with the rest of the legal sufficiency assessment.

Quite aside from the temporal disconnect, which we hold to be dispositive of the proximity factor in this case, even the State's most creative theory of geometric nearness cannot adequately close the gap between the viewer and the viewed. The State, as its working hypothesis, wants to put the appellant in bed in the back bedroom and to measure proximity from that bedstead, condensing the earlier time and the later time into a finite instant. The box of eight cartridges was largely hidden on the cluttered top of a dresser on the far side of the room. Before even turning to the hypothetical illogic of putting the appellant in that bed in that bedroom, we contrast even that hypothetical distance with the notion of proximity as contemplated by Folk v. State:

> In the case at bar, the proximity between the appellant and the marihuana could not be closer, short of direct proof that the appellant herself was in exclusive physical possession of the marihuana. She was one of six occupants in a Valiant automobile and was, therefore, whatever her position in the car, literally within arm's length of every other occupant of that automobile. The marihuana cigarette being smoked was, at any point in time, within direct physical possession of one of those occupants. Proximity could not be more clearly established.

11 Md.App. at 518. (Emphasis supplied.) The State here stretches proximity past its breaking point.

### View or Knowledge

The second of the inculpatory circumstances laid out in Folk v. State is that "the contraband was within the view or otherwise within the knowledge of the defendant." For starters, there is no direct evidence whatsoever that the appellant had any knowledge of

any ammunition in 5 Pebble Drive. There was no evidence at all bearing on the appellant's thought process or knowledge about anything. He did not take the stand. He never said anything to the police except that he lived at 5 Pebble Drive. He was never quoted by any witness as having said anything.

Any knowledge on the appellant's part would have to be inferred from circumstantial evidence. In its brief, the State argued its theory of the appellant's knowledge of the ammunition inferred from the circumstances.

> Eight cartridges of .40 caliber Browning ammunition were found on one of the dressers in the back bedroom of the trailer. This was the same bedroom where the police also found male clothing and mail addressed to Moseley. Taken all together the evidence showed that Moseley lived in the trailer home and the ammunition was found in his bedroom and in the kitchen cabinet. A jury could rationally infer that Moseley would have knowledge of and dominion and control over ammunition that was kept in plain sight in his own bedroom.

(Emphasis supplied.)

The State's theory stressed the fact that a small box of eight cartridges was found on a dresser in the back bedroom, what the State repeatedly labeled as the appellant's bedroom.

> The collective evidence supported the inference that Moseley resided in the back bedroom of the trailer where the ammunition was found… In this case, the ammunition was found on top of a dresser in Moseley's bedroom. Logically, Moseley would have knowledge of and dominion and control over items kept in his bedroom.

(Emphasis supplied.)

19

The State's repetitive theme is that the eight cartridges were at a spot in the bedroom where they would have been within the view of an occupier of that bedroom and that if the occupant could see them, he ipso facto would know about them.

> [T]he ammunition was not hidden from view, it was found on top of a dresser in the bedroom which also contained mail addressed to Moseley, which supports the conclusion that Moseley used that bedroom and thus had knowledge of the ammunition… It was reasonable to infer from this evidence that Moseley would have knowledge of and dominion and control over ammunition kept in plain sight in his bedroom.

(Emphasis supplied.)

The State's reliance on this alleged circumstance, inferred knowledge of the ammunition based on a clear view of the ammunition by an occupant of the bedroom, we hold to be thrice-flawed.

## A. The Time Factor

Just as with the ostensible circumstance based on proximity, the allegedly clear view of the ammunition also flounders on the time line. The location of the ammunition that ostensibly could be viewed is fixed as of the early morning of June 14. Even assuming, purely arguendo, that the appellant regularly slept in the rear bedroom, he was in no position to take a clear view in the bedroom at that time. He was detained at a police stationhouse.

As we have already analyzed with respect to the proximity factor, we cannot assume that the location of the ammunition **NOW** was the exact location of the ammunition **THEN**, to wit, back when the appellant was in a position to take a view of the surroundings in that rear bedroom. We would have to make the additional assumption, which we cannot

20

make, that in the interim between **THEN** and **NOW** that neither the ammunition nor other surrounding items had been moved or in any way disturbed. This non-congruence of critical times alone is enough to negate any inference of knowledge based on the presence of a clear view as a predicate fact for inferring constructive possession. One cannot have had a clear view yesterday of what may only have existed as of today. A permitted inference does not allow for a crystal ball.

## B. There Was No Clear View

The State, moreover, attributes to the appellant the visual acuity of Clark Kent. Even if we indulged the State, <u>arguendo</u>, in its convenient assumption that the back bedroom was the appellant's bedroom, we cannot agree that any ammunition was in clear or plain view.

The bed was on one side of the back bedroom. On the far side of the room was a dresser, on top of which a small box of ammunition was found. A good police photograph reveals that the top of the dresser was in absolute disarray. From the center of the dresser top and occupying much of its left-hand side was a large lamp with a fat base. The right-hand side of the dresser top was a disorganized clutter, containing, inter alia, an ashtray, a set of dark glasses, an electrical plug, a glass with a candle in it, a vial of nail polish, a lipstick, no fewer than six large containers and bottles of moisturizer, plus a debit card belonging to Tanya Swecker.

To the left of the large lamp and against the adjoining wall appears to be a picture and then a healthy stack of mail or other paper items. Wedged between the "mail" and the lamp is a box of Q-tips. On top of the Q-tips and half-obscured (or two-thirds-obscured) by the base of the lamp was the box containing eight cartridges. The box was closed. The

box was turned upside-down. Obscuring half of the front of the box was what appears to have been some sort of an ear piece and on top of the box was what appears to have been a wire extending out from that earpiece.

It is insightful to contrast the absence of any clear view and the consequential lack of knowledge here with <u>Folk v. State</u>'s contemplation of a clear view and its resultant knowledge:

> <u>Nor would there be</u>, under the circumstances of this case, <u>any difficulty in drawing a reasonable inference that the marihuana was within the view, or otherwise within the knowledge, of the appellant</u>. In a darkened car in a dark field, <u>the glow from a lighted cigarette is clearly visible within that maximum radius of four to five feet between the glow and the viewer</u>. <u>Knowledge of the presence of marihuana would be imparted even more emphatically by the sense of smell</u>, in a situation where the cloud of smoke and <u>the peculiar pungent odor filled the interior of a tightly-closed automobile</u>. Neither would the inference be unreasonable that some conversation transpired among the six persons huddled there in the dark dealing with what the cigarette and the fumes were all about. <u>It would, indeed, be unreasonable not to infer knowledge of the marihuana on the part of the appellant</u>.

11 Md. App. at 518. (Emphasis supplied.)

On the cluttered dresser top in this case, nothing short of X-ray vision could have detected the presence of ammunition. To assert that the ammunition was somehow in clear view is, at the very least, a gross exaggeration. A technically unobstructed line of sight to a partially covered and closed container is hardly a clear view. Mt. Fujiyama may be aptly described as being in "clear view." The aptness of the descriptive phrase after that point begins dropping off.

**C. The Male Occupant Of The Back Bedroom**

Having determined that at one end of a possible line of sight the ammunition was not in clear or open view, it is perhaps a case of carrying coals to Newcastle to examine too closely the alleged presence of the appellant at the other end of that line of sight. Nevertheless…

The basic trial strategy of the State has been to reduce the population of 5 Pebble Drive as austerely as possible, thereby enhancing the possessory status and degree of control of the appellant. To be sure, the only occupants that we know of by name are the appellant and Tanya Swecker. The State is content to stop there. It further ensconces the appellant and Tanya Swecker as bedroom partners in the back bedroom. Significantly, not a word in the five-day trial ever suggested the existence of any sort of relationship between the appellant and Tanya Swecker, romantic, proprietary, or conspiratorial. Not so much as a whisper campaign.

The State, however, does not hesitate to use the definite article in referring to the back bedroom as "the bedroom." In the State's telling, it is the "master bedroom" with the master and the mistress of the house ensconced therein. With reference to the appellant, the State does not hesitate to refer to the back bedroom as "his bedroom." It may, however, be jumping the gun in that regard.

Police testimony and the photographs established that 5 Pebble Drive had not one but three bedrooms. 5 Pebble Drive could, therefore, have accommodated not two but up to six sleep-in residents, even if their names are not all known. A quantity of cocaine was also found in the front bedroom. A photograph of the front bedroom shows an unmade bed, as it also shows what appear to be several jackets or other items of men's clothing. This

23

negates the State's reliance on the significance of the fact that the closet in the back bedroom contains both male and female clothing to corroborate the inference of the appellant's occupancy of that bedroom. The State is guilty of cherry-picking its facts.

The evidence strongly suggested that 5 Pebble Drive was a relatively small habitation and the back bedroom seems to have been the most likely place for the occupants and their guests to assemble. This possible secondary function of the room might well account for a letter or a document addressed to the appellant to have been in that room. That letter or document was the only thing linking the appellant to that bedroom and we do not join the State in concluding that the back bedroom was necessarily "his bedroom." It is a redundant observation, however, because the box of ammunition was not in clear view of an occupant of that bedroom in any event, whoever he or she may have been.

## D. Maryland Caselaw

Even assuming, purely arguendo, that the temporal disconnect could be ignored and even further assuming, again arguendo, that the appellant could be placed in the back bedroom where the eight cartridges of ammunition were found, even the appellant's actual presence in the room (not his assumed presence several days earlier) would not have been nearly as suspicious as the defendant's presence in a motel room in Taylor v. State, 346 Md. 452, 697 A.2d 462 (1997). Taylor was one of five persons who had rented a motel room in Ocean City. He was apparently asleep on the floor when the police entered the room. The trial court found him guilty of the constructive possession of marijuana. Judge Raker summarized the case against him:

24

The trial court found that <u>Petitioner was in close proximity to the marijuana</u>; that, because people were smoking marijuana in Petitioner's presence, <u>Petitioner "knew" there was marijuana in the room</u>; that, because he was on the premises asleep or pretending to be asleep, <u>he had some possessory right in the premises</u>; and that <u>the circumstances were sufficient to draw a reasonable inference that Petitioner was participating with others in the mutual enjoyment of contraband</u>. Accordingly, the trial court found Petitioner guilty….

346 Md. at 456. (Emphasis supplied.) In an unreported opinion, the Court of Special Appeals affirmed the conviction.

Without dissent, the Court of Appeals reversed this Court and held that the evidence was not enough to support Taylor's conviction for the constructive possession of marijuana.

Viewing the evidence in the light most favorable to the State, Officer Bernal's testimony established only that <u>Taylor was present in a room where marijuana had been smoked recently</u>, that <u>he was aware that it had been smoked</u>, and that <u>Taylor was in proximity to contraband that was concealed in a container</u> belonging to another. The record is clear that <u>Petitioner was not in exclusive possession of the premises</u>… <u>Possession requires more than being in the presence of other persons having possession; it requires the exercise of dominion or control over the thing allegedly possessed</u>… Without more, <u>Petitioner's presence in the room where marijuana had recently been smoked does not support a rational inference that Petitioner had possessed the marijuana</u>. Furthermore, <u>the existence of smoke in a room occupied by five people does not alone justify the inference that Petitioner was engaged in the mutual use or enjoyment of the contraband</u>.

346 Md. at 459. (Emphasis supplied.)

In <u>White v. State</u>, 363 Md. 150, 767 A.2d 855 (2001), the trial court found White, a passenger in a car driven by another, to have been in joint possession of cocaine found in the trunk of the automobile. This Court affirmed the conviction. The Court of Appeals

reversed. Although White was "in close proximity to the cocaine," he did not exert control over the vehicle.

> Although Petitioner, by virtue of being a passenger in Charity's vehicle, was in close proximity to the cocaine, on this record he did not have a possessory right in, or control over, the vehicle.

363 Md. at 164. (Emphasis supplied.)

The Court of Appeals also held that mere knowledge of the drugs is not enough. The required inference is that to be found guilty, the defendant must have been able to exert dominion or control over the contraband.

> Assuming *arguendo* that there was evidence in the record sufficient to establish beyond a reasonable doubt the knowledge requirement for possession, we conclude nonetheless that there was not sufficient evidence establishing that Petitioner exercised dominion and control over the cocaine.

363 Md. at 165. (Emphasis supplied.)

Judge Harrell's opinion made it clear that the burden the State must carry to support a conviction for constructive possession.

> Circumstantial evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient. It must do more than raise the possibility or even the probability of guilt. [I]t must… afford the basis for an inference of guilt beyond a reasonable doubt.

363 Md. at 163. (Emphasis supplied.)

### Ownership Or Other Possessory Control of the Premises

The third of the factors which Folk v. State lists, 11 Md. App. at 518, as a possible predicate fact that might support an inference of constructive possession of or control over the contraband is "ownership or some possessory right in the premises or the automobile in which the contraband is found."

26

The only indication we have in this case of anyone having any possessory control over 5 Pebble Drive is the implication that such residential control was in Tanya Swecker, through her mother who seems likely to have been the legal owner of the premises. The fact that the appellant acknowledged that he "lives" there was not enough to attribute to him liability for any contraband or other evidence found anywhere on the premises.

The appellant may, of course, have been one of two people living at 5 Pebble Drive. He may, on the other hand, have been just one of five or six people living there. We simply do not know. That lack of knowledge, however, works to the appellant's advantage, because it is the State to which is allocated the burden of proof with respect to the predicate facts that might, if established, give rise to the permitted inference of constructive possession. It was for the State to establish some possessory control over the premises in the appellant. It was not for the appellant to negate such possessory control in himself. In the absence of any hard evidence one way or the other, possessory control over the premises simply did not exist as a predicate fact. That, ipso facto, helps the appellant.

In Moye v. State, 369 Md. 2, 796 A.2d 821 (2002), Moye was convicted of the possession of cocaine, the possession of marijuana, and the possession of drug paraphernalia. This Court affirmed the convictions. This Court relied upon Moye's "residence at a house in which marijuana and cocaine were found in plain view combined with Moye's presence in the specific area in which the drugs were found." The Court of Appeals reversed. At the outset of her opinion, Judge Battaglia announced:

> While a valid conviction may be based solely on circumstantial evidence, it cannot be sustained "on proof amounting only to strong suspicion or mere probability.

27

369 Md. at 13. (Emphasis supplied.)

Key to the reversal of his convictions was the fact that "Moye did not have any ownership or possessory right in the premises where the drugs and paraphernalia were found." 369 Md. at 18. The husband who, with his wife, leased the home testified that Moye was "living" in the house with them. There was no evidence of any proprietary interest in the property other than the fact that Moye, just like the appellant in the present case, was "living" there. The Court of Appeals concluded, "On this record, therefore, we cannot conclude that Moye had any ownership or possessory right to or in Bullock's home." 369 Md. at 18.

The evidence also failed to establish that Moye was "participating with others in the mutual enjoyment of the contraband."

> We also conclude that based on the evidence in this record, no reasonable inference could be drawn that Moye was participating with others in the mutual enjoyment of the contraband. There is no evidence concerning whether Moye, Benson, or the Bullocks were observed using drugs on the night in question. Although the facts may lead a trier of fact to believe that *someone* may have been using marijuana in the Bullocks's home, the evidence fails to establish *who* may have been using it, and *when* such use may have taken place.

369 Md. at 20. (Emphasis supplied.)

Under possessory circumstances significantly more entangling than those binding on the appellant here, the Court of Special Appeals declined to hold that defendants were in constructive possession of marijuana. Puckett v. State, 13 Md.App. 584, 587-588, 284 A.2d 252 (1971)(holding evidence of presence of marijuana plants on property Puckett jointly owned with his wife was not sufficient to create rational inference that Puckett was

in possession of the marijuana); Davis v. State, 9 Md.App. 48, 55, 262 A.2d 578 (1970)(holding conviction for possession that rests only on defendant's co-occupancy of apartment where marijuana was sold and on defendant's intimate relationship with a co-occupant who sold marijuana is not supported by sufficient evidence). And see Taylor v. State, 346 Md. 452, 462, 697 A.2d 462 (1997).

## Mutual Use And Enjoyment Of Ammunition

The fourth and final of the Folk v. State factors, 11 Md.App. at 518, that might give rise to an inference of constructive possession is "the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband."

With respect to this factor, the State is understandably silent. In this case, it is hard to imagine what mutual use or enjoyment one could get out of eight cartridges, except by way of firing them out of a gun. No gun was ever found anywhere in 5 Pebble Drive. What then does one do with cartridges? One cannot eat, drink, or otherwise ingest them. As decorative ornaments, they would need to be taken out of their box. One cannot use them as playing pieces in any conceivable games such as Chinese Checkers or Dominoes. Even if, purely arguendo, one could attribute pleasurable utility to them, the evidence is that the eight cartridges were not being mutually used and/or otherwise enjoyed in this case by anyone. Nobody "was participating with others" in doing anything with any of the eight cartridges. In this case, unlike narcotics cases where it is frequently a significant factor, "mutual enjoyment" or "participation with others" was simply, by the very nature of the crime, a non-factor. It is, to be sure, hard to have fun with a cartridge.

29

## Out of Nothing, Nothing

In <u>Folk v. State</u>, we also stated the converse, stressing the negative factors that argue against joint or constructive possession.

> The common thread running through all of these cases negating joint possession is 1) <u>the lack of proximity between the defendant and the contraband</u>, 2) the fact that <u>the contraband was</u> secreted away in hidden places <u>not shown to be within his gaze or knowledge or in any way under his control</u>, and 3) <u>the lack of evidence from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use of the contraband</u>.

11 Md.App at 514. (Emphasis supplied.)

For several different reasons, but based on the time factor alone, there was no proximity between the appellant and the ammunition. For three separate reasons, the ammunition was not within 1) the clear view, 2) the knowledge, or 3) the control of the appellant. The appellant was not shown to have been in possessory control of the entire premises of 5 Pebble Drive. The appellant was indisputably not participating with others in the mutual use or enjoyment of the eight cartridges of ammunition.

The State has failed to establish a single one of the possible predicate facts from some combination of which an inference of constructive possession of the ammunition might permissibly arise. The evidence, therefore, was not legally sufficient to support the conviction for the unlawful possession of contraband ammunition, based on the necessary theory of constructive possession.[7]

---

[7] The jury's verdict convicting the appellant for the unlawful possession of ammunition, contrasted with its four verdicts acquitting the appellant of the unlawful possession of drugs and drug paraphernalia, was so logically and factually implausible as to warrant this **POSTSCRIPT** by way of possible explanation.

Five counts against the appellant went to the jury. Four of the counts charged the unlawful possession of various drugs and drug paraphernalia. One charged the unlawful possession of ammunition. There was no suggestion of direct physical possession with respect to anything. Every one of the charges was based exclusively on the theory of constructive possession. With respect to all five charges, the rules and the caselaw with respect to constructive possession are precisely the same. With respect to two of the four acquittals, moreover, the predicate facts for inferring constructive possession were significantly stronger that were the predicate facts pointing to the possession of the ammunition.

With respect to any charge of constructive possession in this case, we must indulge the State, arguendo, in the assumption that the temporal disconnect has been solved, to wit, 1) that the circumstances pointing to possession and 2) the possession itself were contemporaneous. We will, arguendo, indulge the State in the further assumption that the appellant slept in the bed in the back bedroom. From that doubly-indulged vantage point, the predicate facts pointing to the constructive possession of both the amphetamine and the narcotic paraphernalia (the scales) were far stronger than were the predicate facts pointing to the constructive possession of ammunition. The amphetamine and the scales were both in the drawer in the nightstand right up against the bed in which the appellant assumptively slept. They were in that assumed posture within his unobstructed view, his immediate touch, and therefore his knowledge.

The ammunition, by contrast, was largely obscured on the top of a dresser on the far side of the room. The amphetamine and the scales, moreover, were more vulnerable to the appellant's participation in mutual use and enjoyment than were eight boxed cartridges without a gun. Notwithstanding a decided tilt in the other direction, however, the appellant was found not guilty of the possession of the amphetamine and the scales, but guilty of the possession of the ammunition. Such an incongruity is, of course, within a jury's power, but it does raise eyebrows.

The explanation would seem to lie in the unpreserved contentions. We are adamant in our determination not to consider contentions that have not been preserved for appellate review, but the discussion of those contentions by both parties in their respective briefs does provide the narrative background to clear up the mystery of the jury's curious behavior. We are by no means suggesting any merit in the unpreserved contentions, but the jury somehow, even if absent plain error, came up with the idea that the guidelines for finding the constructive possession of ammunition are much laxer than are the guidelines for finding the constructive possession of narcotics or anything else. Two questions posed by the jury in the course of its deliberations are the tipoff as to the jury's mistaken notion. On the first occasion, the jury asked:

**JUDGMENT REVERSED; COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.**

---

> **"Can we clarify the law in relation to ammunition? When the Defendant is prohibited, does that mean that he cannot be in the same building as the ammunition?"**

The jury came back with a second question:

> **"Is the Defendant in violation of his prohibition of ammunition simply by being in the same room?"**

Fortunately, we need not open Pandora's Box of unpreserved problems. At a much simpler surface level, the State's case of constructive possession of the ammunition, even by the normal (and quite proper) rules, was so clearly legally insufficient that it is not necessary to range abroad into unpreserved, albeit exotic, alternative theories of defense.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0137s19cn.pdf